IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 22, 2015 Session

## MARTEZ D. MATTHEWS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3252     Mark J. Fishburn, Judge**

---

**No. M2014-01663-CCA-R3-ECN – Filed June 19, 2015**

---

The petitioner, Martez D. Matthews, was convicted of first degree murder and sentenced to life imprisonment. His conviction was affirmed following his direct appeal. State v. Deangelo M. Moody and Martez D. Matthews, No. M2011-01930-CCA-R3-CD, 2013 WL 1932718, at *1 (Tenn. Crim. App. May 9, 2013), perm. app. denied (Tenn. Oct. 17, 2013). Subsequently, he filed a petition for writ of error coram nobis. The basis for the petition was the claim by a co-defendant, who pled guilty to second degree murder for the killing which resulted in the petitioner's conviction, that the petitioner was not involved in the crime. Following an evidentiary hearing at which the co-defendant testified that the petitioner did not kill the victim, the court concluded the witness was not truthful in his testimony. Accordingly, the court denied the petition. Following our review, we affirm the order denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Patrick B. Newsom, Brentwood, Tennessee, for the Appellant, Martez D. Matthews.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Glenn R. Funk, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTS

The evidence resulting in the petitioner's conviction for first degree murder was set out in the opinion of this court denying his direct appeal:

Inez Johnson, the victim's mother, testified that around 4:00 p.m. on April 25, 2009, she and the victim were at their home on Chesapeak Drive. They were lying down in Ms. Johnson's bedroom when they heard gunshots. Ms. Johnson stated that she "instinctively . . . dropped and rolled." She further stated that "instead of laying low and rolling from the bed, [the victim] raised her body up" and was struck by a bullet. The victim began bleeding from her mouth. Ms. Johnson called 9-1-1 and rendered aid to the victim in an attempt to stop the bleeding. She said that she could not tell from where the victim was bleeding. She recalled, "[B]lood was just everywhere, . . . and I was right there beside her[,] and I knew [she] wasn't going to make it[,] and I watched her take her last breath. . . ."

Christopher Cote, a detective with the Metro Nashville Police Department ("MNPD"), testified that around 4:00 p.m. on April 25, 2009, he responded to a call at 3652 Chesapeak Drive. The paramedics were already at the scene when he arrived. Officer Cote was advised that a sixteen-year-old female had been shot. He entered the home and observed the victim lying on the floor, bleeding profusely. The paramedics transported the victim to the hospital, and additional police officers arrived at the scene. Officer Cote stated that he secured the scene and advised his superior officers and investigators as to what had occurred.

Officer Cote recalled that Officer Brian Eaves arrived at the scene. He stated that a witness approached Officer Eaves and gave him a hat that the witness had found. He placed the hat, which the witness found in the street to the right of the victim's house, in an evidence bag and gave it to the crime scene investigators. Officer Cote stated that he also found multiple shell casings of different calibers at the scene.

Lynne Mace, a crime scene investigator with the MNPD, testified that she investigated the scene in this case. She drew a diagram of the scene, which she described for the jury. The diagram depicted the locations of bullet cartridge casings. Investigator Mace also photographed and collected the cartridge casings. Investigator Mace recalled that there were two .45 caliber automatic casings and six 9mm casings. She identified photographs that she had taken of the crime scene, including a photograph of the strike mark of the bullet that entered the victim's house.

Christopher Bridges testified that he lived at 3648 Chesapeak Drive. He stated that on April 25, 2009, at approximately 4:00 p.m., he was walking down Chesapeak Drive with Deandre Williams. As they were walking, a car with four or five people inside of it pulled up and began shooting. Christopher began to run, but he heard more than five shots fired. The State showed him a photograph of a vehicle and asked if it was the vehicle he observed on April 25, 2009, to which Christopher responded, "Yes, sir." Christopher stated that he was given the opportunity to speak with the police about what he observed, but he told them that he "really didn't see anybody, didn't see anything." He said that he did not want to speak with the police and that they forced him to go to the precinct. Christopher admitted that in April 2009, he was a member of the 107 Underground Crips but denied that he was still a member.

On cross-examination, Christopher testified that he did not know why someone would want to shoot at him. He stated that the shooting came from the driver's side of the vehicle. He did not know appellants and said that the first time he saw them was on the news. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. He said that the vehicle's license plate was in the window and that the vehicle's bumper was not damaged. Christopher later testified that the vehicle that he identified in the photograph had damage on its bumper. Christopher said that he ran between some houses when the people in the vehicle started shooting; however, the victim's house was not one of them.

Deandre Williams testified that he lived with Christopher and Christopher's family in April 2009. On April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He ran away and was unable to see from where the gunshots originated. He stated that he was sending text messages on his cellular telephone and did not observe any nearby vehicles or people. However, he recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw the vehicle before he and Christopher began walking. Mr. Williams further testified that he heard more than five gunshots. He estimated that he was three houses away from 3652 Chesapeak Drive when the gunshots began. He ran in the opposite direction from the victim's house.

Mr. Williams denied being a member of or affiliated with the 107 Underground Crips. He stated that he did not know whether Christopher

was a member of the gang and denied noticing a tattoo of a gun with the numbers "107" on Christopher's hand.

On cross-examination, Mr. Williams testified that he did not know appellants and had never seen them before the day of trial. Mr. Williams did not know why anyone would shoot at him. He stated that he did not know anything about the incident and was only testifying because the State forced him to do so.

Evan Bridges testified that he is the grandfather of Christopher Bridges and that they lived at 3648 Chesapeak Drive. At around 4:00 p.m. on April 25, 2009, Evan was outside in the backyard of his home. He heard gunshots and went toward his front yard. When he arrived at the front yard, Evan determined that the gunshots were coming from a small green car that was driving down the street. When shown a photograph of a vehicle, Evan stated that the vehicle in the photograph was the same size, but the car he saw on the day of the shooting looked like a Honda. He observed the heads of three African-Americans in the vehicle and stated that the people in the vehicle were "some young guys."

Evan recalled speaking with three or four police officers, but he denied telling Officer Eaves that he saw two of the three people in the vehicle shooting into 3652 Chesapeak Drive. Approximately fifteen to twenty minutes after the shooting ceased, Evan found a black cap in the middle of the street that was not there before the shooting. He thought that it might have belonged to one of the shooters, so he gave it to the police.

On cross-examination, Evan testified that he did not actually see anyone shoot a weapon. He clarified that the vehicle he saw was green and that the vehicle in the photograph looked like it was blue. Evan stated that he did not see the black cap fall from the vehicle from which the shots were fired.

Quontez Caldwell testified that appellant Moody and Ortego Thomas are his halfbrothers through their father, but he only became acquainted with them a short time prior to this incident. Mr. Caldwell stated that on April 25, 2009, appellant Moody and Mr. Thomas picked him up from his grandmother's house in appellant Moody's vehicle. He identified appellant Moody's vehicle from an exhibit photograph. In addition to his half-brothers, two other males whom he did not know were in the vehicle. He identified [the petitioner] in the courtroom as one of the

4

other passengers in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, the people in the car saw "somebody they had a beef with [sic][,] and they shot at them." He recalled that Mr. Thomas said, "'There go [sic] somebody we beefin' with [sic].'" The driver then turned the vehicle around and drove back up Chesapeak Drive. He said that appellants and Mr. Thomas began shooting at a person he knew as "C. Trigger." Mr. Caldwell did not recall having previously testified that [the petitioner] had a 9mm pistol, that appellant Moody had a ".45 or .40," or that Mr. Thomas had a "38 revolver," but he acknowledged that if he had previously so testified, then it was the truth. He stated that neither he nor the driver had a weapon that day. After the shooting, the men dropped Mr. Caldwell off in the middle of the street. He said that he did not speak with appellants about the shooting after it happened.

Mr. Caldwell stated that the police attempted to interview him. The first two times they attempted to speak with him, he told them that he did not know anything about what happened because he just "didn't want to tell them nothing [sic]." Mr. Caldwell denied being a member of the Hoover Deuce Crips. He denied testifying to being a member in July 2009 and said that if his being a member of the Crips was reflected in his statement, it was not the truth.

On cross-examination, Mr. Caldwell denied that a detective with MNPD brought him in for questioning because he had received information that Mr. Caldwell had claimed that he killed the victim. He further denied getting a new "teardrop tattoo" on his face. Mr. Caldwell did not recall telling the detective that he was anywhere near Chesapeak Drive, that he was with someone named "T.O.," that he was in a Chevrolet Impala, or that he did not know the color of the Impala. He stated that he did not know appellant Moody's real name and that he only knew his father by the name "Tango."

Mr. Caldwell admitted that he spoke with another detective a few weeks later but denied that he changed his story about being in an Impala with T.O. Mr. Caldwell admitted that appellant Moody picked him up and then proceeded to pick up another person, at which time the other person began driving the vehicle. He remembered seeing "C. Trigger" and stated that "guns were pulled[,] and they started shooting." In a subsequent interview with Kathy Morante, an assistant district attorney, Mr. Caldwell denied any knowledge of his brother's having problems with "C. Trigger" and stated, "I didn't know they had no [sic] beef with him." He testified

that his problem with "C. Trigger" was "[s]omething about . . . some child issues" and that it was not significant. Mr. Caldwell denied that the "child issues" concerned his child's mother and could not remember stating that there was bad blood between him and "C. Trigger" or indicating that "C. Trigger" had tried to do him harm in the past. He declined the opportunity to review the transcript of his statement.

Kathy Morante, an assistant district attorney in Nashville, testified that in April 2009, she was assigned to handle juvenile transfers for the office. In the course of her work, Ms. Morante explained that it was fairly common to have witnesses testify for the State who had charges pending against them, as was the case with Quontez Caldwell. She further explained that a cooperating witness in this situation was sometimes given "use immunity." "Use immunity," she testified, was an agreement between the witness, his or her attorney, and the State that provided, "[I]f you sit down and talk with us, we're not going to use anything you say during this period of time that we're talking against you to prosecute you so long as you tell the truth." She added, "[W]e specifically reserve the right to use any other evidence that we can come up with against that person, or as I said earlier, if we determine that [the] person is being untruthful, then we can prosecute them." Mr. Caldwell's use immunity agreement form was entered as an exhibit at trial. Ms. Morante stated that the most serious charge Mr. Caldwell faced in the summer of 2009, when he was fifteen years of age, was an attempted homicide that was unrelated to the instant case. He was taken into custody on June 12, 2009, and in November 2009, he entered a guilty plea to aggravated assault and vandalism and was committed to a secure facility of the Department of Children's Services ("DCS"). Ms. Morante noted that Mr. Caldwell also had an unresolved robbery charge. She explained that DCS determines the appropriate time to "step him down from one facility to another and . . . to release him back into the community."

On cross-examination, Ms. Morante testified that Mr. Caldwell had just been released from DCS when this incident occurred. She met with Detective Jackson and believed that Mr. Caldwell could have some information pertinent to the case, but she did not know whether he was involved. On redirect examination, Ms. Morante clarified that the attempted homicide charge for Mr. Caldwell was wholly unrelated to this incident.

6

Detective Gene Davis of the MNPD testified that on May 15, 2009, he conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. He observed three people inside the vehicle he stopped, and during a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol. Detective Davis stated that [the petitioner] claimed ownership of the weapon, at which time he was taken into custody. Detective Davis identified the weapon, which was entered as an exhibit. He also identified [the petitioner], who was seated in the courtroom.

Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to appellant Deangelo Moody and his mother. He identified the temporary drive-out tag found inside the automobile and noted that it would have been valid on the date of this incident, April 25, 2009. On cross-examination, Detective O'Quinn stated that the Kia automobile in the exhibit photograph appeared green in color to him.

Detective Lawrence Brown, also from the MNPD, testified that he obtained buccal swabs from both appellants on February 9, 2011, at the prosecutor's request. He explained that a buccal swab is used to obtain liquid evidence, usually saliva, from an individual. The swabs were packaged and taken to the Tennessee Bureau of Investigation ("TBI") to be analyzed for DNA comparison.

Agent Mark Dunlap of the TBI Crime Laboratory was accepted by the trial court as an expert in forensic chemistry and serology. He testified with regard to his DNA analysis of a black cap. From his testing, he determined that the "DNA profile from the cap was a mixture of genetic material from two individuals." From the standards submitted in February 2011, ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was [the petitioner].

On cross-examination, Agent Dunlap explained that three of the thirteen testing sites were inconclusive, stating, "[T]here just wasn't enough DNA there to obtain a full profile, so those sites didn't yield results. It doesn't mean that they didn't match, it just means there was no result at those sites." He acknowledged that no DNA belonging to appellant Deangelo Moody was found on the hat.

Agent Robert Daniel Royse of the TBI Crime Laboratory was accepted by the trial court as an expert in firearms and tool mark identification. He explained the operation of the Glock 9mm Luger semiautomatic pistol, the parts of a live cartridge, and the firing cycle process. Agent Royse testified that in his work, he examines the unique set of markings found on every firearm, which can be thought of as a mechanical fingerprint. In making an identification, he test fires the weapon and takes the test bullets and cartridge cases and compares them to the evidence. If the unique characteristics are present on both the evidence and the test material, he concludes that they have a common origin and that they were fired from the same weapon. Agent Royse was provided six spent .45 caliber automatic cartridge casings and two 9mm cartridge casings in April 2009, and in January 2011, he was provided a 9mm weapon for analysis. He testified that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

Chief Medical Examiner Dr. Amy McMaster testified that a former colleague had performed the victim's autopsy but that she had reviewed and agreed with the report that was prepared. She illustrated the bullet entry wound and the path of travel through the victim's body. She identified the projectile recovered from the victim's body and described the procedure in preserving it as evidence. Dr. McMaster stated that the bullet injured the aorta, the trachea, and both lungs and that even immediate medical intervention could not have saved the victim's life. In summary, Dr. McMaster testified that the cause of the victim's death was a gunshot wound to the torso and that the manner of death was a homicide. At the close of Dr. McMaster's testimony, the State rested its case-in-chief.

The defense called William Jackson, a former officer with the MNPD, who testified that he was the lead detective in the investigation of the victim's death. He arrived at the scene approximately five to ten minutes after receiving the call and remained there for approximately three and one-half hours. His duties included making sure the officers secured the crime scene for purposes of investigating and collecting evidence. Detective Jackson was present during the victim's autopsy and collected the bullet recovered from the victim's body as evidence. He recalled testifying at appellants' detention hearing that the recovered bullet was a large fragment and stated, "I didn't know at the time if it was a[.]45 or a[.]40[.] I guessed that it was one of those too big to be a[.]38 or a[.]22."

8

Detective Jackson testified at length concerning his three interviews with Quontez Caldwell. He recalled that his first interview with Mr. Caldwell was at the end of April and the second interview was on June 12th. He explained that he uses conversation as his interviewing technique to get to the truth. He would not make promises of assisting in getting charges dismissed or lowered, but he acknowledged that he would "talk for someone if they cooperate" and admitted that "[he did not] know how the [District Attorney] works."

On cross-examination, Detective Jackson recalled that during the first interview with Mr. Caldwell on April 30, 2009, Mr. Caldwell denied being at the scene or having anything to do with this incident. During the second interview on June 12, 2009, Mr. Caldwell began to cooperate and identified [the petitioner] in a photograph array as one of the individuals involved in this shooting. Detective Jackson testified that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

Id. at *1-6 (footnotes omitted).

The basis for the petition for coram nobis relief was the petitioner's claim that he had just learned a co-defendant on the indictment, which had charged him with first degree murder, would testify that, as to the killing of the victim, the "Petitioner was not shooting and Petitioner was actually trying to stop another from shooting." Subsequently, an evidentiary hearing was held in the matter, at which was presented the testimony of Ortego Thomas and of the attorney who represented Mr. Thomas at his guilty plea hearing.

Mr. Thomas testified that he was serving a sentence following his guilty plea to second degree murder for his part in the same homicide for which the petitioner was imprisoned. He said that, following his guilty plea, he sent a letter to the petitioner, saying that he and Quantez Caldwell, not the petitioner, killed the victim. He said that the petitioner was "just a[n] innocent bystander being at the wrong place, wrong time." The witness described how the killing occurred:

After I fired my shots, I got back in the car. When I got back in the car, I seen Quantez [Caldwell] reach under the seat, grab a gun from under the seat, he already had his gun out and he started shooting up in the air, and by that time [the petitioner] had seen it, and he grabbed the gun and that [is] how his hat fell off.

9

He explained that although he did not tell police officers after the shooting that this is what had occurred, he later decided to do so "to get his conscious [sic] clean."

Counsel for Ortego Thomas at his submission hearing testified that Mr. Thomas waived attorney-client confidentiality so that she could testify at the hearing. She said he told her, at the time of her interview with him, that Quantez Caldwell, holding a pistol in each hand, was the one who killed the victim:

> And that actually Quantez Caldwell is the one that had both of the other two handguns that Ortego Thomas didn't have, Mr. Thomas had the 38, and according to him, Quantez Caldwell grabbed both of the guns and was shooting one from his left hand and one from his right hand over the outside of the car, over the roof of the car, and that [the petitioner], when he realized that, he reached out the window to grab his gun back from Mr. Caldwell who was shooting it, and that's when he lost his hat.

She said that, as the trials of the defendants were being prepared by the State, she was told by the assistant district attorney prosecuting the cases that Mr. Thomas was telling a "contrived story" and that the State would not call him as a witness because he was not being truthful.

In a written order following the hearing, the court explained in detail why the testimony of Mr. Thomas had not been truthful:

> The next inquiry is whether this Court is "reasonably well satisfied" with the veracity of the newly discovered evidence. State v. Vasquez, 221 S.W.3d 514, 527 (Tenn. 2007). A comparison of Mr. Thomas' description of the incident, aside from the testimony of Mr. Caldwell, indicates one (1) inconsistency with the remaining evidence presented at the trial[,] i.e. Mr. Thomas has the shooters firing from both sides of the vehicle, while Christopher Bridges has them firing from the driver['s] side of the vehicle. This conflict in the evidence does not appear to be of much significance at first blush. However, a closer review of this conflict appears to be noteworthy. Mr. Bridges was clear in his testimony that the shots fired were from the driver's side of the vehicle, which was nearest him. This is the side of the vehicle from which Mr. Thomas said he was firing. This being the case, it is unclear how Mr. Thomas would know what transpired behind him since presumably he would be facing his target while firing his weapon, thus having his back to the passenger['s] side. It is also significant that Mr. Thomas does not refute that he had a .38 caliber revolver.

10

Consequently, this means that two (2) people from the passenger['s] side of the vehicle must have fired the 9 mm and 45 cal. Based on the position that Ms. Thomas had each of the occupants in the vehicle, the most likely shooters would have been Mr. Thomas and Caldwell. This conclusion also would be consistent with Mr. Moody not being implicated as one of the shooters by Mr. Thomas.

The argument is made that Mr. Thomas is credible because he has no reason to lie and nothing to gain by coming forward. This is to be compared with the fact that Mr. Caldwell was hoping to gain a more favorable disposition of his case by testifying against his charge partners. Certainly this is a valid argument, but one that loses potency when closely scrutinized. Although it is unclear from the record, a review of all the circumstances in the case would suggest that Mr. Thomas and [the petitioner] were acquaintances before the day of the shooting, notwithstanding Mr. Thomas' statement to the contrary. The uncontradicted evidence indicates that Mr. Thomas, [the petitioner] and Moody arrived together to pick up Mr. Caldwell. The evidence likewise shows that they . . . were all armed and aware of that fact. Although having no experience in such matters, the Court finds that strangers generally are unlikely to randomly meet up and associate for no reason, knowing that the other strangers are armed. It is more reasonable that such occurrences are planned and have some general purpose or common understanding behind the meeting.

The Court also finds the "snitch" factor to be a strong motivator for retribution. It is common knowledge that "snitches" are not well received among the criminal milieu. In fact, they are typically viewed with disdain and ostracized by the criminal element. Although retribution no longer may be an option for Mr. Thomas, satisfaction may be realized by . . . having the result of Mr. Caldwell's "snitching" vacated. Interestingly in doing so, Mr. Thomas himself becomes a snitch, but only . . . to Mr. Caldwell and not Mr. Moody or [the petitioner]. The problem with this account of the events is that it does not explain the physical evidence regarding the shell casings recovered since Mr. Thomas presumably was firing a .38 revolver. Under these circumstances, the Court cannot be reasonably satisfied with the veracity of Mr. Thomas.

Further, the court determined that "the result of the guilt phase of the trial would have been the same even if Mr. Thomas' testimony had been introduced."

11

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c) (2012).

The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this issue, therefore, under an abuse of discretion standard.

As the co-defendants of Mr. Thomas were being prosecuted, the State decided not to call him as a witness because, in the opinion of the prosecutor, he was not being truthful. The coram nobis court, following a lengthy and careful analysis, reached the same conclusion, that Mr. Thomas had not been truthful at the evidentiary hearing and that, even if he had told at the petitioner's trial this new version of the facts, the result of the guilt phase of the trial would have been the same. We cannot conclude that the coram nobis court abused its discretion in this determination and, accordingly, affirm the denial of the petition.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the denial of the petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE

12